IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, *et al.*, § | | |
| § | | |
| Plaintiffs, § | | |
| § | | |
| v. § | | Civil Action No. 3:11-CV-0294-N |
| § | | |
| TGC, LLC, § | | |
| § | | |
| Defendant. § | | |

## **ORDER**

This Order addresses the cross-motions for summary judgment of Plaintiffs Ralph S. Janvey in his capacity as receiver and the Official Stanford Investors Committee (collectively, the "Receiver) [doc. 36] and Defendant TGC, LLC ("Golf Channel") [33]. Because the Court determines that Golf Channel looks more like an innocent trade creditor than a salesman perpetrating and extending the Stanford Ponzi scheme, the Court grants Golf Channel's motion and denies the Receiver's motion.

### I. GOLF CHANNEL'S ROLE IN STANFORD'S SCHEME

This case arises out of the SEC's imposition of a receivership for R. Allen Stanford's massive Ponzi scheme. The Securities and Exchange Commission filed suit in this Court requesting the Court to appoint a receiver over Stanford individually and several related entities. As part of that litigation, this Court assumed exclusive jurisdiction and took possession of the "Receivership Assets" and "Receivership Records" (collectively, the "Receivership Estate"). *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130]

(the "Receivership Order"), in *SEC v. Stanford Int'l Bank*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009). The Court appointed Ralph S. Janvey to serve as Receiver of the Receivership Estate and vested him with "the full power of an equity receiver under common law as well as such powers as are enumerated" in the Receivership Order. *Id.* at 3. Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. Additionally, the Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *Id.* at 5. In this action, the Receiver seeks to recover money paid to Golf Channel for advertising, which money the Receiver contends was fraudulently transferred to Golf Channel.

Stanford, through a network of financial advisors, sold certificates of deposit ("CDs") from Stanford International Bank Ltd. ("SIB") in Antigua to investors on the premise that they would yield above-market returns because of Stanford's investment strategy focused on safe, liquid investments. In fact, Stanford did not invest the proceeds of CD sales in safe investments, but rather in speculative, illiquid private capital investments and in funding

Stanford's lavish lifestyle. To conceal his criminal enterprise, Stanford created a network of approximately 130 different entities in 14 different countries. To keep the pyramid going, Stanford needed an ever-increasing number of financial advisors who would sell the CDs to their investor clients.

Beginning around 2005, Stanford embarked on a marketing campaign to increase public awareness of the Stanford brand. The campaign focused on sports. In particular, Stanford focused on golf because the demographics of golf fans skewed toward higher income males, which was the same demographic Stanford targeted for its CD sales. Stanford arranged with the Professional Golfers' Association of America ("PGA") to sponsor the Memphis PGA Tour event, which would then be called the Stanford St. Jude's Championship, St. Jude's being a well-known charitable children's research hospital.

When Stanford's sponsorship became known, representatives of Golf Channel approached Stanford regarding advertising. Golf Channel is a cable television network that programs golf content to golf fans. It makes money, in part, through selling advertising. The demographics of Golf Channel viewers matched Stanford's target – high net worth males. Golf Channel offered Stanford a variety of paid media services, including primarily commercial airtime for Stanford advertisements, and also coverage of the Stanford St. Jude's Championship, logo exposure, etc. Golf Channel had no control over the content of Stanford's advertisements and did not otherwise design Stanford's media strategy. The advertisements Stanford chose to run were primarily institutional, seeking to raise awareness of the Stanford enterprise to assist in recruiting financial advisers, rather than directly

promoting the sale of CDs.[1] During 2007-08, Stanford paid Golf Channel just less than $6 million. The Receiver now attempts to recover that money.

## II. CHOICE OF LAW AND FRAUDULENT TRANSFER BASICS

The Court recently considered choice of law in a similar context in *Janvey v. Alguire*, Cause No. 3:09-CV-0724-N (Jan. 22, 2013) [909] (the "Net Winners Order"). The Court determined in that Order that the Stanford Ponzi scheme was centered on Texas. *Id.* at 8-9. Golf Channel here notes that its headquarters and only studios are in Florida, and the Court finds that Florida is its domicile. Both Texas and Florida have adopted versions of the Uniform Fraudulent Transfer Act ("UFTA"). *See* TEX. BUS. & COM. CODE §§ 24.001, *et seq.*; FLA. STAT. §§ 726.101, *et seq.* The Court has previously determined that among UFTA states, there is no conflict of law. *See* Net Winners Order at 12-14.[2] The Court adopts that conclusion on these facts as well, and for convenience will cite to the Texas Uniform Fraudulent Transfer Act ("TUFTA").

Under TUFTA, a transfer is fraudulent if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1).

---

[1]The parties dispute whether the summary judgment record shows one way or the other that Golf Channel's advertising resulted in the sale of more fraudulent CDs than Stanford would have sold in any event. Because the Court would reach the same result either way, this dispute is not a genuine issue of material fact that precludes summary judgment. The Court will assume for the sake of discussion that the advertising had its desired effect and indirectly resulted in the sale of additional fraudulent CDs.

[2]In the Net Winners Order, as here, the transferees (here Golf Channel) note a possible conflict between the Eleventh Circuit and Fifth Circuit's construction of UFTA. As in the Net Winners Order, *see* Net Winners Order at 12 n.7, the Court finds this potential conflict does not affect the analysis of these facts. *See infra* Part III.B.

Proving that a transferor operated a Ponzi scheme establishes as a matter of law the fraudulent intent. *See Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) (citing *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)). The summary judgment record here establishes as a matter of law that Stanford operated a Ponzi scheme. *Accord Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 188-89 (5th Cir. 2013); *Janvey v. Alguire*, 647 F.3d at 597. Therefore, the Receiver is entitled to recover from Golf Channel, *see* TEX. BUS. & COM. CODE § 24.008, unless Golf Channel can establish an affirmative defense. Section 24.009(a) provides a defense for "a person who took in good faith and for a reasonably equivalent value . . . ." *Id.* § 24.009(a). The Court holds that, based on the summary judgment record, Golf Channel took in good faith.

Courts analyze reasonably equivalent value in a two-step process. *See, e.g.*, *Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*, 491 B.R. 747, 770 (Bankr. W.D. La. 2013); *Pension Transfer Corp. v. Beneficiaries Under the Third Amd. to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212-13 (3d Cir. 2006). Courts first determine whether value was given, and then determine whether that value was reasonably equivalent. *E.g.*, *In re Freuhof*, 444 F.3d at 212-13. Because there is substantial disagreement on the first issue, and none on the second, the Court will reverse the order of the two steps here.

TUFTA provides that "'[r]easonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have

sold the assets in an arm's length transaction." TEX. BUS. & COM. CODE § 24.004(d).[3] The Court holds that, based on the summary judgment record, Golf Channel provided its services to Stanford within the range of value that would have obtained in an arm's length transaction and that, in fact, the transaction between Stanford and Golf Channel was an arm's length transaction. The Court thus holds that if Golf Channel's services provided "value," that value was reasonably equivalent.[4]

Thus the only remaining issue is whether the consideration Golf Channel provided to Stanford constitutes "value" as used in TUFTA.

### III. GOLF CHANNEL PROVIDED VALUE

TUFTA defines "value" as follows:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

---

[3]This is a TUFTA-specific definition, though it is consistent with UFTA jurisprudence.

[4]It is not entirely clear whether the Fifth Circuit follows the "totality of the circumstances" test for reasonable equivalency. *Compare Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126 n.7 (5th Cir. 1993) (noting Fifth Circuit did not adopt a mechanical test in *Durett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir. 1980), and that other circuits use totality of circumstances test, but not expressly adopting that test) *with WRT Creditors Liquidation Trust v. WRT Bankr. Master File Def'ts (In re WRT Energy Corp.)*, 282 B.R. 343 (Bankr. W.D. La. 2001) ("The Fifth Circuit follows the 'totality of the circumstances' approach to determining reasonably equivalent value and has rejected the use of a mechanical mathematical formula." (citing same *Fairchild* footnote)). On this summary judgment record, that question is immaterial, so the Court does not address it further.

TEX. BUS. & COM. CODE § 24.004(a). The comments to UFTA § 3 (the corresponding Uniform Act section) provide:

> Section 3(a) is adapted from § 548(d)(2)(A) of the Bankruptcy Code. *See also* § 3(a) of the Uniform Fraudulent Conveyance Act. The definition in Section 3 is not exclusive. "Value" is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition. The definition does not specify all the kinds of consideration that do not constitute value for the purposes of this Act – *e.g.*, love and affection. *See, e.g.*, *United States v. West*, 299 F. Supp. 661, 666 (D. Del. 1969).

UFTA § 3 cmt. 2.

Two things are notable from the text and comment. First, the statutory text is not an exclusive definition of value. The text and comment are not particularly helpful in terms of identifying what else might constitute value, or indeed, what else might not constitute value beyond the exemplars of love and affection. Second, because section 3(a) (and Texas section 24.004(a)) are derived from section 548(d)(2)(A) of the Bankruptcy Code, courts have found construction of that section of the Bankruptcy Code to be persuasive in construing this section of the Uniform Act. *See, e.g.*, *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 594 (9th Cir. 1991).

The Receiver's arguments encompass two ideas that the Court believes are best considered distinctly. First, the Receiver argues that from the perspective of creditors, the Golf Channel advertising had no value. Second, the Receiver argues that as a matter of public policy, services that advance a Ponzi scheme have no value as a matter of law. The Court will consider those arguments in turn.

### *A. Consumables Can Have Value Under TUFTA*

The UFTA command that value is determined from the perspective of the creditors appears to be aimed at the typical argument that transfers to family members (or spiritual advisers) give only nonmonetary value to the debtor. *E.g.*, *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 248-49 (5th Cir. 1990) ("The relevant inquiry under section 24.03(a) is whether the debtor received monetary, not spiritual, consideration."). This language appears to have raised an unintended consequence in dealing with consumables. From a creditor's point of view, consumables, once consumed, have no value. It seems wrong, however, to hold that every transaction in which a debtor acquires consumables is a fraudulent transfer. Fortunately, this is not the first court to consider that issue.

The Fifth Circuit case most on point is *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119 (5th Cir. 1993). Fairchild manufactured commuter aircraft. Air Kentucky was a commuter airline affiliated with USAir. Fairchild viewed Air Kentucky as a potential customer of many of Fairchild's aircraft, but Air Kentucky was in poor financial condition. To boost Air Kentucky's finances, an affiliate of Fairchild bought the company. Unfortunately, USAir did not approve of that arrangement and threatened to terminate its relationship with Air Kentucky. This placed Fairchild and its affiliate in need of promptly propping up Air Kentucky and selling it to a third party. In the short term, Air Kentucky's fuel suppliers refused to provide any more fuel on credit. Fairchild agreed to pay Butler Aviation for Air Kentucky's fuel so Air Kentucky could remain in business. *Id.* at 1123-24.

Air Kentucky continued flying for four months, as Fairchild paid Butler for Air Kentucky's fuel and Fairchild's affiliate pursued a sale of Air Kentucky. Then USAir informed Fairchild's affiliate that it did not approve the proposed buyer of Air Kentucky. Air Kentucky then gave up the ghost. Fairchild continued paying Butler for fuel Air Kentucky had used while it was in operation until Fairchild itself went into bankruptcy. Fairchild's "Fiscal Agent," Whyte, then sued Butler on a fraudulent transfer theory. The bankruptcy court denied relief for Fairchild's payments to Butler made while Air Kentucky was still flying, but granted relief for those payments Fairchild made after Air Kentucky ceased operations. *Id.* at 1124.

After considering some of the value Fairchild obtained by keeping Air Kentucky flying, the Fifth Circuit observed:

> Finally, we note that Whyte's attempt to foreclose inquiry into the value derived from Air Kentucky's continued operation is misguided. According to Whyte, the only value that can be considered is property actually received. Under this view the value of an investment – no matter how large and how probable the potential return – cannot be considered unless it actually pays off, and only to the extent that it does so. Under such a postulation, anyone who provides, deals with, or invests in an entity in financial straits would be doing so at his or her peril under § 548; which means, of course, that few would be likely to do so.
>
> The narrow "realized property" approach to value advanced by Whyte finds no approbation in the law. Rather, the recognized test is whether the investment conferred an economic benefit on the debtor; which benefit is appropriately valued as of the time the investment was made. Courts have considered such indirect financial effects as, for example, the synergy realized from joining two enterprises, the increase in a credit line, and the increased monetary "float" resulting from guaranteeing the loans of another, as constituting value received under § 548. We conclude that, when viewed within the appropriate frame of reference, the benefits flowing to Fairchild from keeping Air Kentucky in operation is likewise value for purposes of

§ 548. And, as discussed above, we also conclude that, for purposes of § 548, the value realized by Fairchild for fuel payments made while Air Kentucky was still flying was sufficient to constitute reasonably equivalent value.

*Id.* at 1126-27 (footnotes omitted).

The Fifth Circuit's holding is consistent with other circuits that have considered speculative investments that ultimately were of no benefit to creditors. In *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139 (3d Cir. 1996), the court held that a financing commitment letter that had a very small chance of maturing into financing (and in fact did not) had value. *Id.* at 152-53; *see also id.* at 148-50 ("totality of circumstances" test for reasonable equivalence does not apply to threshold inquiry of whether debtor received value).[5] In *Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.)*, 914 F.2d 458 (4th Cir. 1990), the court held that the stock of

---

[5]The *Mellon* court offered an instructive example:

But the price that the debtor paid, in and of itself, reveals nothing about whether the debtor received something of actual "value." A simple example illustrates our point:

Within one year of filing for bankruptcy, D pays a window-washer $1,000 to clean the windows in an office building. The $1,000 constitutes the going rate for such a job, and the window-washer is unaware of D's financial condition.

That the $1,000 D paid represents the fair market value of the window-washer's services and that the transaction was at arm's length say absolutely nothing about whether the debtor received "value;" *"value" was conferred because D obtained a palpable benefit from the service performed – i.e., clean windows.*

*Id.* at 149 (footnote omitted, emphasis added).

a company had value when the only asset the company had was a 1 in 22 chance of winning a cellular license in an FCC lottery. Finally, in *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir. 1995), the court held that gambling losses were not fraudulent transfers because at the time the bet was placed, it had value. "The time that counts is not the time when the bet is won or lost, but the time when the bet is placed." *Id.* at 771. In considering the trustee's argument that value is determined from the viewpoint of creditors, and the bets left the creditors with no benefit, the court concluded with the following analogy:

> If, instead of gambling, Mr. and Mrs. Chomakos had spent $7,710 on expensive dinners, the creditors would have been no better off than they are now. Yet the trustee concedes that the restaurateur would not be liable for return of the money – and when asked at oral argument how money spent at a blackjack table differs from money spent at a dinner table, the trustee had no satisfactory answer.

*Id.* at 772.

A case following *Chomakos* provides the most direct analysis of consumables. *Samson v. U.S. West Commc'ns, Inc. (In re Grigonis)*, 208 B.R. 950 (Bankr. D. Mont. 1997). Ms. Grigonis, a 72 year old widow in an assisted living facility, incurred several thousand dollars in charges from calling various 900-number psychic hotlines. The trustee sought to recover those funds as fraudulent transfers, arguing that the phone calls had no value from the perspective of the creditors. The court rejected that argument:

> Generally speaking, courts have held that for the purposes of fraudulent conveyance avoidance, the proper standpoint for subjective valuation is that of the creditors. *See Gill v. Maddalena (In re Maddalena)*, 176 B.R. 551, 555 (Bankr. C.D. Cal. 1994); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir. 1991). This furthers the policy behind § 548 by preserving assets of the estate for eventual distribution to claim holders. *Id.* The general rule, however, if applied blindly without regard for

>the nature of consumer transactions, will result in absurdity. For instance, circumstances like the ones at hand involve strictly consumer transactions in which a debtor transfers funds in exchange for a personal service that can yield no pecuniary return to the debtor. To the contrary, once accepted, the purchaser immediately and completely consumes the benefits of such services, and therefore, the services received have a liquidation or "second-hand" value of zero. Thus, consumer purchases for solely personal gratification furnish only "psychic and intangible" benefits or "entertainment value" to the debtor personally, and by definition, always results in asset depletion. *See Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771, 772 (6th Cir.1995). By the same token, transfers of funds to secure such enjoyments can by definition be of no value to creditors, and consequently, if only the viewpoint of creditors signifies, such transfers must by definition be regarded only as fraudulent. *This result is of course nonsense.*

*Id.* at 955-56 (emphasis added).

Applying this body of law to the facts before the Court, the Court holds that Golf Channel provided value. First, the fact that Golf Channel's transaction with Stanford did not result in a tangible asset on which Stanford's creditors could levy and execute is not dispositive. The Receiver's argument to the contrary proves too much; if the Receiver were correct, he would have a fraudulent transfer claim against the power company for the electricity Stanford used and against the water company for the water used. "This result is of course nonsense." *Id.* at 956. Second, holding Golf Channel provided value is consistent with the temporal analysis of *Fairchild*, 6 F.3d at 1127 ("benefit is appropriately valued as of the time the investment was made") and *Chomakos*, 69 F.3d at 771 ("The time that counts is not the time when the bet is won or lost, but the time when the bet is placed."). Stanford made its investment and placed its bet when it agreed with Golf Channel to pay money in exchange for advertising time and services. Value is determined when the contract is still

executory, not after Stanford has consumed the services. The right to air commercials on Golf Channel has value; otherwise Golf Channel's business model would crash.[6]

The Court's conclusion that Golf Channel provided value is consistent with public policy. First, the Receiver's position would simply favor one group of creditors – investors – over another group – trade creditors. "Unless one creditor is more culpable than another, there is no reason to prefer one creditor over another." 3 ROY S. GEIGER, BANKRUPTCY LITIGATION § 17:83 (Westlaw 2013) (discussing reasonably equivalent value for things useless to unsecured creditors). Second, the Receiver's position would shift the risk of loss, and the corresponding duty to investigate, from investors and brokers to trade creditors. It is impractical to expect trade creditors to conduct a forensic investigation into the business of all of their customers in the ordinary course of their business.[7] On the other hand, investors (or their advisors) should assess the risk of their investment and the corresponding potential reward as a matter of course. The Court sees no reason to shift that risk and duty.

Accordingly, the Court holds that the advertising time and related services that Golf Channel provided to Stanford constitute "value" under TUFTA.[8]

---

[6]Although it is not clear if these factors relate to the threshold value inquiry, or only reasonable equivalency, the Court again notes that the transaction was arms' length, in good faith, at fair market value, and in the ordinary course of business.

[7]*See Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 658-59 (Bankr. M.D. Fla. 2002) (Third party vendors and landlords "only deliver goods or rent buildings and have no reason and, more importantly, no duty to inquire into the nature of the debtor's business.").

[8]This case is thus different from those cases involving political contributions, *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013),

### *B. Golf Channel's Services Only Incidentally Advanced Stanford's Scheme*

In addition to those cases addressing reasonably equivalent value from the viewpoint of creditors, there is possibly an additional line (or two) of cases dealing specifically with Ponzi schemes.[9] One derives from *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425 (Bankr. N.D. Ill. 1995); the other from *Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985 (D. Utah 1986). The court in *In re Randy* analogized sales commissions to investors' claims for profits:

> The court in *Independent Clearing House* [77 B.R. 843 (D. Utah 1987)] found that to allow an investor to enforce his contract for profits in excess of the principal would only further the debtor's Ponzi scheme at the expense of the investors. *Independent Clearing House*, 77 B.R. at 858. Similarly, if this Court were to enforce the contract for sales services between the Defendants and the Debtor, it would only help finish what Randy long ago started, which is, defrauding many innocent investors.

189 B.R. at 441. In *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006), the Fifth Circuit relied on *In re Randy* (and other cases) to hold that a broker in a Ponzi scheme did not provide reasonably equivalent value for his commissions. *Id.* at 560. The Receiver argues from this line of authority that goods or services that advance a Ponzi scheme, such as Golf Channel's, as a matter of law and public policy do not confer value.

In *Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325 (11th Cir. 2002), the Eleventh Circuit rejected the categorical approach of *In re Randy* and

---

or charitable contributions. *See Scholes v. Lehmann*, 56 F.3d 750, 759 (7th Cir. 1995).

[9]Whether this is a distinct body of law or simply an instance of broader reasonably equivalent value jurisprudence is a question this Court need not now answer.

*Warfield*, in favor of a case-by-case determination of the value of services provided to a Ponzi scheme, relying on *In re Universal Clearing House Co. Id.* at 1332-33. Ironically, *Independent Clearing House*, upon which *In re Randy* relied, and *Universal Clearing House*, upon which the Eleventh Circuit relied, were two different appeals to the same district court from the same underlying Ponzi scheme bankruptcy.

Even *In re Randy*, however, acknowledged the difference between salesmen actively promoting the Ponzi scheme and trade creditors:

> It is possible that others providing ordinary services to Randy not involving the Ponzi scheme, especially employees of the Debtor, might have deserved to be paid for their services because they acted in good faith and gave value to the debtor.

189 B.R. at 442. The Court holds that even the Fifth Circuit would except ordinary trade creditors from the per se rule of *In re Randy*. Thus, the Court need not engage in a choice of law analysis between Texas and Florida or the Fifth and Eleventh Circuits.

The Court further finds that Golf Channel here is in the role of a trade creditor. Golf Channel did not actively promote Stanford's Ponzi scheme or sell CDs. It simply provided a pipe to customers' televisions. It was up to Stanford to determine what content flowed through the pipe. Golf Channel no more promoted Stanford's Ponzi scheme than the electric company that kept the lights on or the office supply vendor that sold the paper used to print

the CDs.[10]  Accordingly, the Court holds that the Ponzi scheme public policy exception (if any) does not preclude holding that the services provided by Golf Channel conferred value.

### CONCLUSION

The Court holds that on the summary judgment record Golf Channel gave reasonably equivalent value, and the Court therefore grants Golf Channel's motion for summary judgment and denies the Receiver's motion for summary judgment.[11]

Signed November 5, 2013.

_____
David C. Godbey
United States District Judge

---

[10]While it is tempting to try to articulate a grand analytical framework of general applicability for reasonably equivalent value, it is sufficient for the day simply to resolve the case now before the Court.

[11]Given the Court's disposition of the motions for summary judgment, it denies Golf Channel's objection to the Receiver's supplemental appendix as moot. The Court certainly does not condone filing additional summary judgment evidence with a reply brief.

ORDER – PAGE 16